Harold Hyman, J.
The full import of this litigation and non-jury trial becomes ¡self-evident as the scenario of the unusual factual pattern is elicited. To that end the court must first turn to an exhibit introduced by plaintiff Ozone in this action, that is, the resolution adopted by the Board of Standards and Appeals on October 16, 1956 which, in setting forth the factual background, states:
That the premises affected is Block 11396, Lots 25 and 142 (Queens County); and
That the premises consists of :a plot on which are located five buildings used for paint factory and storage: that it is proposed to erect a two-story and cellar extension to Building No. 1 to be used exclusively for the storage of paint and paint products in sealed containers and the storage of bulk pigments; that of the five buildings, Buildings Nos. 1, 2 and 3 are provided with certificates of occupancy providing for the manufacture and storage of paint products, that Building No. 4 is a watchman’s residence erected under Application No. N. B. 7692-1940 for which no certificate of occupancy was ever issued and that Building No. ¡5, a storage building erected under the same N. B. 7692, is similarly without any certificate of occupancy;
That no new use is sought to be included; that only the existing storage use is sought to be extended to the proposed extension, level with the adjoining two-story paint factory already existent; that the proposed extension will not be used for the manufacture of paints, but only for storage.
The resolution also explains that in 1920 the premises, then existent, was leased to tenant (applicant) owner Adelphi Paint and Color Works, Inc., for use as a paint factory; that certificate of occupancy No. 328 (Feb. 10, 1922) was issued to Adelphi based ¡on its application permitting the two-story building then existing to be used as a factory; that in 1929 land and buildings on Lot 32 were purchased by Adelphi which rebuilt Buildings Nos. 2 and 3 after a fire; the rebuilding did not necessitate reconstructing the four outer walls. Apparently they were not affected by the fire. It is observed that Lot 25, the one flffected by this litigation, has thus far not been mentioned during this period of the 1920s, at all.
The resolution continues:
In 1936 Adelphi, one of plaintiff’s predecessors, purchased Lot 25 and built a fireproof structure iivfor storage purposes ”. It is to be noted that the resolution is devoid of *746 any facts which indicate any issued permit to build any type of “ structure ” on Lot 25, nor does it mention any application made to permit any such construction, nor does it speak of any certificate of occupancy relevant to any such construction, although it is referred to as Building No. 1 (erected 1936) later on in the resolution. The other Buildings Nos. 2 and 3 indicate their construction in 1933, and Buildings Nos. 4 and 6 in 1940.
The board then resolved that the application for a variation be granted to permit the “ construction of the additional building * * * for the storage of paint all in containers ”, i.e., the “ extension to Building No. 1”.
The “extension” was thereupon built pursuant to Application Alt. ,No. 2624-1949, completed on October 4, 1957. The Fire Department certification was made on October 24, 1958 and certificate of occupancy No. Q125715 was issued on November 3,1958.
It is apparent from a reading thereof that the November 3, 1958 certificate of 'Occupancy No. Q125715 not only includes the new (1958) “ extension” to the building, .which extension was built on Lot 25 and which lot had been purchased in 1936, but that it also includes the old storage building built in 1936, allegedly also on Lot 25, for which no certificate of occupancy had previously .ever been granted. How the first (1936) construction was allowed to be used without a certificate of occupancy for the period from approximately 1936 to 1956 (predecessor to Administrative Code of City of New York, § C26-50.0) to then brazenly be cited in an application for a variance, indicating the borough superintendent’s rejection thereof in the first instance, to then become part of a resolution of the Board of Standards and Appeals in 1956 granting such variance, is completely incomprehensible to this court, but it was cited and the board did grant it. Apparently certificate of occupancy No. Q125715, issued on November 3,1958, is claimed to cure all prior deficiencies which may have been previously overlooked by administrative agencies under whose jurisdiction buildings, construction, and the right to construct, use or operate them, were then controlled.
In any event, from the said resolution of the Board of Standards and Appeals there appears to be sufficient proof that Building No. 1 was built on Lot 25 in 1936, but there is very equivocal evidence as to whether the “ extension ” (Alt. No. 2624-1949, completed October 4, 1957, certificate of occupancy issued November 3, 1958, No. .Q125715) was built wholly on *747 Lot 25 or if it was wholly or partially constructed on Lot 142 since the certificate of occupancy speaks of it as being on Lots 25 and 142. This is a major, a vital, issue in this case, the reason appearing infra herein.
To continue: The evidence further indicates that Adelphi vacated the buildings and land by January 1,1972 and that from that time on a great deal of vandalism of the buildings took place, so that on May 10, 1972 the Fire Department of the City of New York, having made an inspection of Building No. 1 at 85-20 Dumont Avenue, found and reported the building to be: vacant, open, unguarded and unsealed; an accumulation of rubbish or combustible waste outside the building; the second floor rear unsafe or unprotected as -to floor openings; structural damage; vandals have broken windows; all doors leading into building not secured; building unattended; minimal amount of combustible rubbish in the building. Based upon the above findings, the Fire Department certified the building vacant of all tenants, abandoned or deserted and seriously neglected by the owner and the above conditions (as reported) a danger to life and health. Building No. 2, also located at the same address, was likewise similarly certified, as was Building No. 3.
The evidence also indicates numerous inspections by the Department of Buildings from April 26, 1972, the first of which reports shows the building to be open to public entry, vacant, unguarded, a fire hazard, a haven for vandals and derelicts, doors and windows broken and open, accumulation of garbage and debris, concrete retaining wall cracked and leaning to west lot line. Reports of inspections even beyond the above date show the “ buildings unsafe ”.
Thereupon, U. B. Order No. 107-1972, dated November 21, 1972, was issued by the City of New York, Department of Buildings, Department of Health, and was issued to the plaintiff Ozone, directing plaintiff to commence making Buildings Nos. 1, 2 and 3 in Block 11396 on Lot 25 .safe and secure by properly securing the buildings against unauthorized entry satisfactory to the Superintendent of Buildings or by demolishing the buildings ; this also in accordance with the resolution of the Board of Health adopted October 22, 1970; in that regard, the evidence indicates that the order was personally -served on plaintiff on November 28,1972 and also by mail on November 28,1972. The moving papers in plaintiff’s proceeding in the Supreme Court, Queens County, under Index No. 3996-1973, brought against the City of New York (of which judicial notice has been taken by this court) clearly -indicate plaintiff’s receipt of such order in *748 the latter part of November, 1972; there is, therefore, no issue as to the propriety, receipt or ¡service of the order raised by plaintiff herein, nor could it raise any issue as to propriety of1 the order (Administrative Code, § 564-19.0).
Plaintiff1 nevertheless claims that it retained a general contractor at an agreed price of $6,500 (actually, some evidence shows the amount to be $6,000), who allegedly commenced work on December 1,1972, did something, but never finished the work, leaving the conditions of the inside of the buildings and of the outside ¡of the buildings virtually as bad as when he started; he claimed he was paid $1,500 for his work, but neither he nor plaintiff ever produced any business record, check or receipt for such payment. Both contractor and plaintiff’s chief witness testified that the contractor never came back, but ‘ ‘ that he was waiting to be called to complete the work
Sufficient to state, the plaintiff made exceedingly slight, if any, effort to comply with the order; testimony along such lines was highly equivocal at best and this court has given no credence to it.
This ¡court finds, as a fact, that the conditions of the buildings complained of and ordered to be remedied, or the buildings secured or demolished, at the time the ¡order was served, remained virtually unchanged, .in effect, and the conditions for all intents and purposes identically the .same; that the conditions were neither corrected nor remedied, the buildings were not safely secured, nor was the order to demolish complied with. These premises had become a ‘ ‘ public nuisance ’ ’ before the order was made; it was a ‘ ‘ public nuisance ’ ’ when the order was made; it remained a ‘ ‘ public nuisance ’ ’ even after the order was madeiand served and plaintiff could have been charged with criminal failure or refusal of compliance (Administrative Code, §§ 564-16.0, 564r-6.0). Plaintiff at no time was in any enviable position and, by (its deliberate failure and refusal to comply with the order, plaintiff should not be allowed to benefit; it did not make even an honest effort to -at least minimize the dangers to life and health of children or adults who, it had notice, were entering the buildings to vandalize, as well as use, the premises as derelicts and/or trespassers.
¡Since ¡the order to secure or demolish was based upon the Department of Health investigation and resolution, the first statutory road sign to plaintiff was the one which provides that all orders of that department shall be regarded as in their nature judicial and be treated as prima facie and legal and that in any action or proceeding the right of such department to make *749 such order or cause the execution thereof shall be presumed. (Administrative Code, § '564-2.0, subds. a, b.) It has been held that orders of that department are to be thusly treated and considered. ■ (Matter of Silverman v. Department of Health of City of N. Y. 252 App. Div. 678.) But was plaintiff thereupon fully foreclosed of bringing any action? The answer is it was not. Plaintiff could have applied for a “ stay of execution ” or a “ modification of said order ’ ’ which would have resulted in a statutory automatic stay or suspension of the order and would have thereupon obtained a hearing before the board, thus enabling it to present facts and proof against the order and therefore in favor of its modification or revocation since the board has the power to either modify, vacate or rescind its order (Administrative Code, § 564-19.0), but if the board directed compliance and if plaintiff did not comply with such direction within the time designated, the order may be executed and/or, in addition thereto, plaintiff could have been charged with a misdemeanor, convicted and fined (Administrative Code, § 564^6.0 [Penalties]). If plaintiff was still dissatisfied with the determination even after a hearing, it also had the right to apply for an injunction to the Supreme Court by commencing an action for an injunction or proceeding pursuant to CPLB article 78 (Administrative Code, § 564-12.0).
Since the order had been issued by the Department of Health jointly with the Department of Buildings (Administrative Code, § 643a-12.0), what effect did the order have insofar as the proceedings of that latter department? Here, again, the Administrative Code of the City of New York provides that a certificate of noncompliance shall be presumptive evidence of any matter stated therein (Administrative Code, § 643a-7.0) and that a violator is guilty of committing a misdemeanor and is subject to fine or imprisonment or both (Administrative Code, § 643a-8.0). In addition to the foregoing, the department commissioner may, in his discretion, request the' Corporation Counsel to institute f ‘ legal proceedings ’ ’ to abate such nuisance or to compel compliance; to obtain a preliminary injunction, restraining orders or other provisional remedies with or without notice (Administrative Code, § 643a-6.0); even the “work” safely securing the buildings could have been executed by the department to abate the nuisance through the officers, agents or contractors of the department, the costs thereof to become a lien on the property (Administrative Code, § 643a-9.0).
There is still another provision of the Administrative Code which is of the utmost ^importance, that is section C26-80.0 *750 which provides that: “ Any structure or part of a structure or premises that from any cause may at .any time become dangerous or unsafe, structurally or as a fire hazard, or dangerous or detrimental to human life, health or morals, shall be taken down and removed or made safe and secure. A vacant building which is not continuously guarded shall have all openings sealed * * * and it shall be the duty of the owner thereof promptly to make any repairs * * * necessary for the purpose of keeping such building sealed. Any vacant building not continuously guarded or not sealed and kept secure against unauthorized entry # * * shall be deemed dangerous and unsafe as a fire hazard and dangerous and detrimental to human life, health and morals within the meaning of this article.”
Since the plaintiff did not take any or sufficient steps to remove the conditions existing from November "2-8, 1972 to January 12, 1973, on that latter date the Housing and Development Administration advertised for sealed bids in the Gity Record to demolish Buildings Nos. >1, 2 and 3 on Lot 25, Block 11396, Queens County; the bids closed on January 23, 1973 and the contract was then let out to certain third parties. Demolition commenced on or about April 11, 1973. Then, four months after the order had been served and after considerable demolition had already been completed, plaintiff first commenced a proceeding for an injunction in this court which it settled by stipulation on record dated April 27,1973 and by court order made thereon on December 20, 1973.
There is no doubt that the buildings involved were dangerous public nuisances, but as such they were never declared to be in such condition as to be deemed ‘ ‘ imminent peril to the public health ” which required immediate destruction or demolition instead of sealing and securing, without first pursuing, statutory “due process ”. Granted that the city had a mandatory duty to abate the nuisance (Matter of Jewett v. Luau-Nyack Corp., 31 N Y 2d 298, 304, 305; Runkel v. City of New York, 282 App. Div. 173, 177), it also owed a corresponding and equal duty to plaintiff not to violate its (plaintiff’s) constitutional rights to “ due process of law ”, nor to confiscate its (plaintiff’s) property lawfully acquired or held by plaintiff corporation without “ due process ” (N. Y. Const., art. I, § 6; New Fork Cent. & Hudson Riv. R. R. Co. v. Williams, 199 N. Y. 108). This court holds that it owed such duty to the plaintiff; the evidence in defendant’s own files also indicates that it did.
The court previously pointed out that since plaintiff failed to comply with the order to “ safely secure or demolish ”, there *751 existed the right in the Department of Buildings to execute the order itself by “ safely securing” the building and charging, by lien, all costs and expenses for such .work against the premises (Administrative Code, § 643a-9.0); also by criminal prosecution .subjecting plaintiff to a fine, imprisonment or both (Administrative Code, §§ 643a-8.0, 643a-fiL1.0); or by the commissioner through the medium of the Corporation Counsel instituting legal proceedings against plaintiff to correct or abate such violations or to compel compliance with such order, with the judgment thereon to become a lien on the premises from the date of the filing of a notice of pendency (lis pendens) in the County Clerk’s office, with said judgment to have priority before any mortgage or other lien existing prior to such filing (Administrative Code, § 643a-6.0; see, also, '§ C26-85.5).
In addition to the foregoing, there also existed an “ Unsafe Building Proceeding ” which was provided for by the Administrative Code (§ 026-80.5) which defendant’s agency, Department of Buildings well recognized; it even had such a file for these premises; that statute (Administrative Code, § C26-80.5) provides for certain .safeguards for the rights of “ due process ” by persons “interested” in the premises, as follows: “ (a) The owner, or one of1 the owners * * * agents, lessees or any other person who may have a vested or contingent interest in the structure or premises, shall be served with a written notice containing a description of the structure or premises deemed unsafe or dangerous, or detrimental to human life, health or morals, and an order requiring such structure or premises to be made safe and secure, or removed * * * and made safe and secure as may be deemed necessary by the superintendent. Such notice shall require the person thus served immediately to certify to the superintendent his acceptance or rejection of the order. The notice shall further notify said person that upon his refusal or neglect to comply with any requirements of this section or of section C26-81.0, a .survey of the premises * * * will be made in accordance with section 026-81.5 * # * [and] * * * if the premises * * * are reported unsafe or dangerous by the surveyors, their report will be placed before the supreme court and that a trial * * * will be had before such .court * * * to determine whether the * * * structure or premises shall be * * * repaired and secured * * # or taken down and removed ”. (Emphasis supplied.) 'Subdivision b provides the manner of service of the “ notice ” and ‘ ‘ order ’ ’. The ensuing sections thereafter provide for voluntary abatement (§ 026-81.0); for the “ survey and survey *752 ors ” (§ C26-81.5, subd. a); posting of the survey on the buildings (§ 026-81.5, subd. b); compensation of surveyors (§ 026-81:5, subd. c); judicial review of survey (§ 026-82.0, subd. a); precedence of proceeding (§ C26-82.0, subd. b); and finally, if the court determines the building “unsafe”, the court’s issuance of a ‘‘ precept ” to repair or take down the structure and the legal proceeding which thereafter follows to completion and final termination judicially (§§ C26-82.5, 026-83.0,026-83.5).
The Administrative Code of the City of New York was carefully drawn; its authors prepared such statutes with a view to upholding the individual’s (corporate’s) rights against expropriation of one’s property and to the constitutional right to “ due process of law ” (N. Y. Const., art. I, § 6).
This court finds that the defendant City of New York flagrantly violated the very code under which it was working as to such buildings it may have caused to be demolished on Lot 25 only; that the procedure followed by the city, even in the face of its own building department inspector recommending the proper procedure in his report of June 2, 1972 [wherein he stated “Recommend immediate survey” and to which report he attached his own “ Survey Report ”, with the latter survey also signed by the supervisor of inspectors], was totally uncalled for and illegal; that no prior “notice” had been served or posted; that only an “ order ” was served; that the three buildings alleged to have existed, but by a fair preponderance of the credible evidence not, as to all of them, yet definitively proven to have so existed on Lot 25, were demolished without plaintiff’s having been afforded its constitutional right to ‘ ‘ due process ’ ’; that the demolition of the buildings in this case does not come within the purview of any ‘ ‘ emergency situation ’ ’ wherein demolition without any formal hearings or proceedings before the court may have some reality of justification (as, for example, a structure in imminent danger of collapse after an earthquake, fire or bombing). Here the physical facts speak for themselves and there was no proof indicating these buildings were in “imminent danger of collapsing”. The latter conclusion is well indicated by the fact that even the defendant city moved very slowly from June, 1972 to April, 197-3 before commencing demolition.
The defendant -City of New York is herewith found liable as to any alleged buildings 1, 2 and 3 on Lot 25, but is found free from any liability for any demolition as to any buildings or structures not shown to have existed on Lot 25; it is definitively *753 found not liable for any structure on Lot 142. Plaintiff will have to look to other sources for any possible recovery as to any structural demolition on Lot 142 or any other than on Lot 25.
Had this court the right to disregard the legalities of this situation and to apply its own equitable conscience instead, this plaintiff would nót come out of this scoffing at the order of1 the administrative agencies of the ¡City of New York, smelling like a rose in a garbage dump. To the contrary, the complete disregard of the order, the deliberate and knowledgeable refusal to comply with the order, which may have secured the safety of some human being from possible harm or may have prevented some innocent, but playful, child from hurt, would have tipped the .scales of fairness, decency, responsibility and morality the other way, that is, in favor of the city, and certainly not in favor of this plaintiff.
Fortunately for the plaintiff, this court is legally constrained to apply only the legalities and has no power to legislate by judicial decision.
The issue of liabilty in this split, nonjury, trial is thus determined ; the balance of the action, i.e., the issue as to damages, if any, suffered by plaintiff, of any building or structure (Nos. 1, 2 and/or 3) on Lot 25 is herewith set down for trial before this court on December ¡6,1974.